## ROGERS *vs.* MURRAY and others.

*Where, by the division of the county of Washington, lands mortgaged to the old loan officers of that county fell within the limits of the new county of Warren; Held that, under the act of the 12th of March, 1819, the loan officers, upon a foreclosure or sale of the mortgaged premises, were bound to publish a copy of their advertisement of sale in a newspaper in Warren county.*

*A sale made by the loan officers without giving the notice required by law, is invalid, and will be set aside upon the application of the owner of the mortgaged premises.*

*Where there is a resulting trust under a conveyance, it must arise at the time of the execution of the deed.*

*After the legal title has passed to the grantee by the execution of the deed, a resulting trust cannot be raised by the subsequent application of the funds of a third person for the improvement of the property, or for the payment of the purchase money, so as to divest the legal estate of the grantee.*

July 17.

IN September, 1786, N. Seely, who was then the owner of lot No. 8, in the Queensbury patent, containing 250 acres of land, mortgaged the same to the Old Loan Officers of the county of Washington, to secure the payment of £32. One hundred acres of this lot was purchased by Reuben Morgan, in May, 1797, and a conveyance was taken to himself in fee; and the residue of the lot passed into the hands of other purchasers. By some arrangement with the former owner of the lot, but which did not distinctly appear in this case, the one hundred acres in the hands of Morgan became equitably liable to the payment of the whole sum remaining due on the loan office mortgage. Morgan accordingly paid the annual interest thereon, up to and including the year 1825. D. & I. Merritt, in 1805, recovered a judgment in the supreme court against Morgan, in an action of debt, on which there appeared to have been due $481,88 and interest, from the first of June, 1805; which judgment was subsequently assigned to Jeremiah Rogers, the father of the complainant. In 1794, John Murray made his will, and authorized his executor and executrix to sell his estate, and gave the bulk of the proceeds to his son James Murray, one of the defendants in this cause, to be paid over to him by the executor and executrix, at twenty-

one. In August, 1797, the widow of Murray, who was the executrix, and J. Eddy, the executor, made probate of the will, and afterwards sold the estate. Morgan subsequently married the widow ; and in 1806 he procured himself to be appointed guardian of the defendant, James Murray, who was then an infant, and he afterwards possessed himself of the estate of the infant. At the time of his appointment as guardian, Morgan executed, under the order of this court, a mortgage upon the 100 acres called the Morgan farm, to the people of the state of New-York, as security for the faithful performance of his trust as such guardian. Upon that guardianship a large amount was due to the defendant Murray, from Morgan ; the balance having been settled by arbitration between the parties, in May, 1826, at $2625. In June, 1818, the Morgan farm was sold by the sheriff of Warren county, upon an execution issued on the Merritt judgment, and was purchased by the complainant in this suit, for $550. No money was paid on the sale, but the complainant appeared to have purchased in the property with the consent of his father, who was the assignee of the judgment ; and it was conveyed to the complainant by the sheriff accordingly. In December, 1821, the complainant executed to Morgan a written agreement, by which he covenanted to reconvey the farm to Morgan, or his assigns, upon the payment to the complainant of $506,88, in four equal annual instalments, with interest annually, and also upon payment to J. Cramer of a debt of about $420, for which Jeremiah Rogers had become security for Morgan. Two or three payments were made by Morgan, on account of the sum which, by this agreement, was to be paid to the complainant. On the same day of the execution of this agreement Morgan executed a sealed instrument to the complainant, reciting that agreement, and by which he covenanted that in case of the non-performance of any part of the conditions in that agreement contained to be performed on his part, the complainant should have the peaceable possession of the premises so purchased at the sheriff's sale. Shortly after the arbitration between Morgan and Murray, in 1826, Morgan quit-claimed to the latter, in part satisfaction of the amount awarded to him,

·all his interest in the Morgan farm ; that being all the prop-
erty or means he had for satisfying the award. The interest
which became due on the loan office mortgage in 1826 not be-
ing paid, the New Loan Officers of the county of Washington,
to whom the mortgage had been assigned under the act of the
14th of April, 1820, advertised the mortgaged premises for sale,
at the court house in Salem, on the third Tuesday of Septem-
ber in the same year. The premises were situated in the town
of Queensbury ; and by the division of Washington county in
1813, that town was set off as a part of the county of Warren.
The loan officers, however, took no notice of that circum-
stance, but advertised and sold the premises upon notices affixed
and published in the present county of Washington only, al-
though there was a public newspaper published in the county
of Warren. The complainant had no information that a sale
was to take place, and did not attend. Murray employed the
defendant J. G. Haviland to bid off the lot for him, under an
arrangement by which the purchaser was to release to the
owners of the other 150 acres of the lot all the interest which
he should acquire in that part of the premises under the sale,
reserving only the Morgan farm for the benefit of Murray.
The loan officers were informed of the equitable claim which
Murray made to the Morgan farm, and of the arrangement or
understanding by which the rights of the owners of other parts
of the lot were to be preserved. The lot was accordingly sold
at public vendue, in the usual manner. No person bidding
a higher sum, it was struck off to the defendant Haviland,
for the sum of $56,91, the balance due on the mortgage,
together with interest and costs ; and was thereupon convey-
ed to him by the loan officers. Haviland subsequently re-
leased the other 150 acres to the owners thereof, and they
were not made parties to this suit. The complainant after-
wards tendered to Haviland the amount of his bid, and de-
manded a release of the Morgan farm. He also tendered to
the loan officers the amount of the interest and costs due on
the mortgage, which they declined receiving, on the ground
that they had already raised the whole amount by a sale of
the premises. He therefore filed his bill in this cause to set
aside the sale, on the ground of illegality in the notices of the

sale, and also on the ground of fraud. The whole lot was admitted, by the answers, to be worth $5000, and the Morgan farm about $2000. The proof showed that the farm was worth about $2800.

*D. Buel, jun.* for the complainant.

*J. Crary*, for the loan officers.

*R. Weston,* for the other defendants.

THE CHANCELLOR. Although the property in this case was sold for a very small sum, when compared with its real value, yet having been sold at public auction, under a special law which allowed to the loan officers no discretion on the subject provided enough was bid to pay the amount due with interest and costs, the sale cannot be disturbed, if there was no fraud in the case, and if all the requirements of the law have been complied with. The defendants, by their answers, deny all fraud ; and I see nothing in the evidence to contradict this denial on their part, as to any actual and intended fraud. I am not, however, prepared to say it was not against public policy, and a constructive fraud upon this complainant, as the owner of a part of the mortgaged premises, for the purchaser to enter into an arrangement which would prevent the owners of other parts of the mortgaged premises, or their friends, from paying off this small incumbrance, or from running the lot up to something like its true value to save them from loss. It cannot be doubted in this case that if the agreement to release the other one hundred and fifty acres had not been entered into, the small sum due on this mortgage would have been paid off, by the owners of that part of the property, or by some of their friends who had notice of the intended sale ; or if an actual sale had taken place, that this property, which was worth at least $5000, would not have been sacrificed for less than $57. At sales of this kind any individual has a right to bid what he pleases, and to obtain the property as low as he can, provided he adopts no means, and makes no arrangements which will have

the effect to prevent competition, and thus to produce a sacrifice of the property. But if he adopts any expedient by which those who are present at the sale, or those who otherwise would have attended as purchasers, are induced not to bid, if the price at which he obtains the property is wholly disproportionate to its real value, this court may interfere for the protection of the injured party. As the loan officers had no authority to adjourn the sale, and could not themselves become purchasers of the property, they cannot be answerable for the consequences of any underhand arrangements to prevent competition to which they were not parties, and over which they had no control. The conclusion at which I have arrived on another point in this case, however, renders it unnecessary for me to decide whether the arrangements that were made previous to the sale, and to which arrangements the purchaser was a party, were of themselves sufficient to avoid the sale.

The principal question which is presented by the pleadings and proofs relates to the regularity of the notice of the sale which was given by the loan officers. Previous to the examination of that part of the case, however, it may be proper to notice the objection made on the part of the defendants to the jurisdiction of the court, that the complainant has an adequate remedy at law if the sale was made without giving the proper notice according to the provisions of the statute. The answer to this objection is, that by the default in the payment of the interest due on the mortgage in 1826, the loan officers became seized of the whole legal estate in the mortgaged premises ; so that no ejectment could have been maintained by the complainant, even if the sale was void. (*Jackson* v. *Voorhies,* 9 *John. Rep.* 129.) The 13th section of the act of the 8th of February, 1788, (2 *Greenl. Laws,* 51,) does indeed provide for a revesting of the estate of the mortgagor, upon the payment of the amount due, with the costs, at any time before a legal sale has been made. But as the loan officers refused to receive the amount of the interest and costs, the complainant could not redeem the premises, so as to reinvest himself with the legal title, except by the aid of this court, and by making the loan officers parties for that purpose.

The original act of the 18th of April, 1786, under which this mortgage was taken, (1 *Greenl. Laws*, 247, § 20,) required the premises to be sold at the court house of the county where the lands lay; and notices of the time and place of sale were to be fixed up at not less than three of the most public places in three or more towns, precincts or districts of the county where the premises were situated. That is, the notices were to be fixed up at three or more public places in the county, which public places were to be in three or more towns or precincts of the county; and not, as insisted upon by the complainant's counsel, at three or more public places in each of the three towns or precincts. As the loan officers were not authorized to loan upon any property except such as was situated within the county for which they were appointed, and as there were court houses in all those counties, there could have been no difficulty, either as to the place of sale, or as to the manner of giving notice thereof, or as to the inspection of the books and accounts of the loan officers, if divisions or alterations of the original counties had not afterwards taken place. But the counties of Albany and Montgomery were soon after divided into several counties. It then became a question whether the sales were to take place at the court houses in the original counties, in the same manner as if those counties had not been divided, or whether the sales of such parts of the mortgaged property as fell within the bounds of the new counties should be advertised and sold in the county where the premises were then situated, according to the literal interpretation of the act of February, 1786. As the latter construction was adopted by the loan officers, another difficulty occurred. There might be two sales of different lots, one lying within the present bounds of the county for which the loan officers were appointed, and the other within the limits of the new county. As the sales were, by the statute, to be made on a particular day, it would be found impracticable for the loan officers to attend at both places at the same time, and one sale must of course fall through. Again; as no court house had yet been erected in some of the new counties, it was impossible to have a literal compliance with that

1832.

Rogers
v.
Murray.

part of the statute which required the mortgaged premises to be sold at the court house of the county where the land lay. The legislature appear to have adopted the construction of the loan officers. And to remedy these difficulties, and some others which had occurred in the execution of the statute, the act of the 21st of March, 1791, (2 *Greenl. Laws*, 365,) was passed. By the fifth section of that act, which applied to the loan officers of Albany and Montgomery, probably the only two counties which had then been divided since the loan of 1786, the sales were directed to be made at the court house or place where the court of common pleas should have last been holden in the county where the premises were situated. And if it should so happen that the loan officers could not attend at the different sales on the day prescribed by the statute, they were then authorized to adjourn any sale by advertisement to a further day, not exceeding fourteen days. To pay the loan officers of these counties for their extra services in advertising and attending the sales of lands in the several counties in which the same fell by such divisions and alterations of the original counties, the act of the 11th of April, 1792, (2 *Greenl. Laws*, 480,) gave to each of the loan officers an addition to his salary of ten pounds. Other divisions of counties having afterwards taken place, and similar difficulties having arisen in the execution of the act of the 14th of March, 1792, relative to the new loan, further legislation on this subject became necessary. The act of the 25th of February, 1799, was therefore passed, the third section of which was in force at the time the sale now in question took place. By that section, (2 *Kent & Radcliff's Laws*, 300,) which recited the great inconveniences which had arisen to the loan officers of several of the counties by reason of the division or alteration thereof, the loan officers of any county in the state were authorized to advertise and sell, all lands mortgaged to them, within the county in which such loan officers were originally chosen or appointed, any alteration or division of such county or any former law to the contrary notwithstanding. The sale in question was made in conformity to the provisions of this act; and if no subsequent alterations had been made in the law, the proceedings in this case would

1832.

Rogers
v.
Murray.

have been perfectly regular, so far as the loan officers were concerned. But by the fourth section of the act of March 12th, 1819, (5 *Laws of N. Y.* 38, *a*,) the loan officers, in addition to the notice previously required by law to be given of the sale, were directed to cause a copy of their advertisement to be published for eight weeks, immediately preceding the day of sale, in one of the newspapers published in the county in which the mortgaged premises are situate; or if no paper was published in such county, then in the county nearest thereto in which a newspaper was published. I am aware that in the case of *The People* v. *The Supervisors of Delaware*, (5 *Cowen's Rep.* 436,) the supreme court have decided that a sale was properly made at the court house of the original county; and that it was not necessary to advertise in the new county where the premises are situate. As the sale took place subsequent to 1819, that case was not properly decided, if it appeared from the return to the alternative mandamus that there was a public paper printed in the county of Delaware for eight weeks immediately preceding the sale. It is evident, however, from the report of that case, and from the opinion of the chief justice, that it was decided upon an examination of the original act only; that the counsel for the defendants did not call the attention of the court to the various acts to which I have before referred, by which a legislative construction had been given to the original law in connection with the division and alterations of counties; and that the act of 1819 was also overlooked by them. The original act, independent of the practical construction which had thus been put upon it, might well bear the interpretation given to it by the chief justice; although I perceive that one of the difficulties which he suggests, the impossibility of the loan officers being at the court houses of two or more counties at the same time, exists in reference to the new provision on this subject incorporated into the revised statutes. (1 *R. S.* 373, § 44.) Under the provisions of the act of 1799 and the subsequent act of 1819, both of which were in force when this sale was made, there could be no difficulty; as the only additional duty required of the loan officers, where the several parcels of land to be sold lay in two or more counties, was to have their notice of sale

published in a newspaper printed in each county. This court, in the case of *Denning* v. *Smith*, (3 *John. Ch. Rep.* 344,) decided that a sale made by loan officers, without giving the proper notice, was invalid, and that the purchaser was bound to see that the special authority given to the commissioners was pursued. This sale, therefore, cannot be supported.

I think there is no evidence in this case which would justify me in the conclusion that the Morgan farm was originally purchased with the money of Murray, so as to give him the legal title as a resulting trust. It appears from the recital in the quit-claim deed of 1826, from Morgan to Murray, that the farm was purchased by Morgan in May, 1797. This must have been before his intermarriage with the widow of John Murray. It appears from the probate of the will, which is among the defendant's exhibts, that as late as August, 1797, she was unmarried ; as letters testamentary were then granted to her and to John Eddy, by the name of Anstis Murray, executrix, and John Eddy one of the executors. After the legal title has once passed to the grantee by the deed, it is impossible to raise a resulting trust so as to divest that legal estate, by the subsequent application of the funds of a third person to the improvement of the property, or to satisfy the unpaid purchase money. The resulting trust must arise, if at all, at the time of the execution of the conveyance. (*Per Jones, Chancellor, 2 Paige's R.* 238.) If the defendant Murray had only an equitable claim or lien upon the Morgan farm, upon the ground that his funds had been applied to the payment of the purchase money, or to make improvements upon the estate, subsequent to the conveyance, that equity cannot avail against a bona fide purchaser of the legal estate, whether the purchase was under a judgment or otherwise. And there is no evidence here that the complainant had notice of any such equity at the time of the sheriff's sale.

But the defendant Murray, as the assignee of Morgan's interest in the property, is entitled to a specific performance of the contract of the 10th of December, 1821, for the re-conveyance of the property, upon the payment of the balance due according to the terms of that agreement. If the defendants Haviland and Murray shall elect to have a specific per-

formance of that agreement, and shall, within thirty days after service on them or their solicitor of a copy of the order to be entered in this cause, give a written notice of such election to the solicitor for the complainant, with a stipulation for the payment of such balance as may be found due upon the said contract, within such time as this court may direct, then there is to be a reference to a master residing in either of the counties of Washington or Warren to ascertain the amount thus due. To the end, that upon the coming in of the master's report, such decree may be made in the premises as shall be just. In that case, the question of costs, as between the complainant and all the defendants, is to be reserved until til after the coming in of the master's report.

If the defendants Murray and Haviland do not elect to have a specific performance, the decree must declare that the sale and conveyance by the loan officers was made without the due public notice of the sale which was required by law, and that they are inoperative and void, as respects the interest of the complainant in the mortgaged premises; and that he has a right to redeem the one hundred acres called the Morgan farm, by paying to the loan officers the amount due on the mortgage at the time of the sale, with interest thereon since that time. And upon the payment of the sum of $56,91 to the said loan officers, together with the interest thereon from the time of the sale, the defendants, or such of them as are in possession of the Morgan farm, must deliver up to the complainant the peaceable possession thereof. And the defendants Haviland and Murray must pay to the complainant his costs in this suit to be taxed.

The defendant Morgan was properly made a defendant, with a view to the settlement of the question as to the specific performance of the agreement originally made with him. He has therefore no claim for costs as against the complainant; and he has no claim for costs to be decreed over against his co-defendants Murray and Haviland, under the circumstances disclosed in these pleadings and proofs. As the loan officers have acted in perfect good faith, and have only mistaken their duties arising out of the complicated legislation in relation to sales of this description, I see no reason for charging

them with any part of the costs of a controversy in which they had no personal interest; and which has been carried on solely for the benefit of the purchaser or his cestui que trust.