## In the matter of the Estate of Samuel Eckstein, a Lunatic.

The authority which the Court of Common Pleas have over the estate of a lunatic is not derived so much from the statutes giving that Court equity jurisdiction, as from the constitution of the state.

In England, the exclusive authority over the persons and estates of those *non compotes mentis*, belongs in the first instance to the sovereign, but in practice it is delegated to others.

In England the personal estate of a lunatic was appropriated to the equal payment of his debts, first, however, securing to him, even against his creditors, a sufficient maintenance. Subsequent statutes give to the Court of Chancery control of the real estate.

A committee appointed by the Court of Common Pleas, under the Acts of Assembly of this state, exercises a similar control over the estate of a lunatic as a bailiff in England, and the property under the charge of a committee is in *custodia legis*.

The management of the estates of lunatics and drunkards, by the statutes of this state, is under the control of committees appointed by the Court; who from time to time will direct them in their management, and especially as to their disposition and the payment of debts, and appropriations for his support and that of his family.

A creditor, after an individual has been declared a lunatic, may bring his action in a court of law and serve the process upon the committee, and have the amount there ascertained, but cannot issue an execution to enforce the collection of a judgment. He must come into the Court of Common Pleas, which is exercising a control of the estate of such lunatic, for the payment of a claim thus ascertained.

If a claim is not disputed, the creditor may apply by petition to the Court for an order upon the committee for its payment. But in disputed claims, the amount due must first be ascertained by a trial at law, and after a verdict and judgment, application should be made to the court having the custody of the estate of such lunatic, for payment.

It is not competent for any creditor of a defendant found a lunatic by due course of law, to issue and levy an execution on his personal property in the hands of the committee appointed by the Court; but the sole remedy of such creditor against the personal estate of a lunatic, found such by inquisition, in order to obtain payment of his claim, is an application to the Court, who, when a proper case is shown, will compel the funds necessary for its payment out of the estate of the lunatic to be so appropriated.

An injunction will be issued against a creditor, who issues an execution and levies upon personal property in the hands of the committee of a lunatic, compelling him to stay proceedings. An injunction was awarded in this case to restrain a creditor.

*Nov.* 12. This was an application by William Conrad, the committee of one Samuel Eckstein, a lunatic, praying for an injunction against Ann Hertzog, administratrix of Peter Hertzog, deceased, commanding to stay her proceedings upon an execution which had been issued against said lunatic, after he had been declared such, although the judgment was obtained prior to the finding of such inquisition. All the facts necessary for a clear understanding of the questions decided being sufficiently stated in the opinion of the Court, it is deemed unnecessary to repeat them.

KING, President.—William Conrad filed on the 29th of October his petition, in which he sets forth that Samuel Eckstein, by due process issued out of this Court, was, on the 7th of March last past, declared a lunatic, and to have been one since the 20th day of January, 1842, and that the petitioner was duly appointed a committee of his estate.   That on the 12th day of January, 1842, judgment was entered in favour of Peter Hertzog, against the said Samuel, in the District Court for the city and county of Philadelphia, in the penal sum of *twenty thousand dollars*, on a bond (by virtue of a warrant of attorney thereunto annexed), dated the 14th of September, 1841, conditioned for the payment of $10,000, with interest on the 14th of September, 1842.   That this bond was accompanied and secured by a mortgage of the same date, on certain valuable property in the county of Philadelphia.   That, on the 15th day of October, 1842, after the death of Peter Hertzog was suggested, an execution was issued by Ann Hertzog, administratrix of said Peter, and levied, on all the *personal property* of said lunatic, which is now in the charge and custody of the sheriff of Philadelphia county, under the said execution.   That the said Ann Hertzog, administratrix, persists in enforcing the execution for the whole debt and interest appearing to be due on the judgment, which it is said would be attended with a ruinous sacrifice, highly prejudicial to the interests of the lunatic and his family, and to his creditors, who are numerous, and to a large amount, and equally or more meritorious in the character of their claims with the said Ann Hertzog, and entitled to participate in the proceeds of the sale of the property levied upon.

The petition then proceeds to allege certain facts and circumstances, from whence, if established by proof, it might be fairly inferred, that the bond is, in whole or in part, satisfied by set-offs, which the lunatic has against the intestate's estate.   On the filing of this petition, together with a special affidavit as to the facts set forth in it, the petitioner moved that a special injunction issue, to restrain Ann Hertzog, administratrix, from proceeding on her execution against the personal property of the lunatic until further order.   Mrs. Hertzog having been brought into Court under a notice of this motion, and heard through counsel, we are now called upon to determine whether the petitioner is entitled to the assistance of the Court in the manner prayed for.   The case is before us under the petition; no counter affidavits having been produced impugning any of its statements.   From the discussions at the bar, however, it seems the execution plaintiff was prepared to produce such proofs, if requi-

site, but did not, because the case was discussed on the broad ground that no creditor has the right to levy an execution on the *personal* property of a defendant (who has been found lunatic under a commission) in the hands of his committee; but that the sole remedy of the creditor is by petition to this Court, requiring the committee to pay the debts from the effects of the lunatic, and this whether said creditor is a judgment-creditor or otherwise.

The question, therefore, for decision is one of great magnitude, whether we regard the pecuniary interest of this execution creditor, or the general principles involved. In this Commonwealth it is entirely new, nothing analogous being found in any judicial precedent. Deserving, therefore, it has received our most careful consideration.

The authority of this Court over the persons and estates of lunatics is derived, not from the recent statutes giving equity jurisdiction to this Court, but from the sixth section of the fifth article of the constitution of the Commonwealth. By the clause of our organic law, it is declared, "that the Supreme Court, and the several Courts of Common Pleas, shall, beside the powers heretofore usually exercised by them, have the *power of a Court of Chancery*, so far as relates to the perpetuating testimony, the obtaining of evidence from places not within the state, *and the care* of the *persons* and ESTATES of those who are *non compotes mentis.*" This clause remains in our amended constitution, in the exact form in which it was introduced into the constitutions of 1776 and 1790, and undoubtedly gives us all the jurisdiction exercised by the English Courts of Chancery over lunatics and their estates. If our authority extended no further, we might perhaps have more difficulty in extending the aid to this petitioner asked for. At law, actions could be maintained against lunatics, and neither the insanity of a defendant at the time of his arrest (Nut *v.* Verney, 4 T. R. 121), nor its occurrence subsequent (Kevnot *v.* Norman, 2 T. R. 390), gave any exemption to such unfortunate beings from civil detainer. (Ex parte Lighton, 14 Mass. Rep. 207.) And Chancery has recognised this rule of law, although with apparent regret at its effects: Anon. 13 Vesey, 589; Hastings, ex parte, 14 Ves. 182.

For the better understanding of the question under review, it is necessary to inquire into the nature and extent of the authority exercised by the English Courts of Chancery over the persons and estates of persons of unsound mind; how far their powers have been enlarged and extended by the laws of this Commonwealth;

F

and whether from both any authority can be deduced, analogous to that invoked by this petitioner.

Generally speaking, the exclusive authority over the persons and estates of *non compotes mentis* belongs in the first instance to the sovereign, although in practice it is delegated to others. This authority is recognised in the statute *De Prerogativa Rege*, 17 Edward 2, ch. 9 and 10, which, according to the better opinion, are declaratory of pre-existing rights and duties. In practice it is always given to the Lord Chancellor, Lord Keeper, or Lords Commissioners, and is a standing warrant to them to exercise control themselves and grant it to others, over the persons and estates of those found *non compotes mentis*. The extent of this power in the Chancellor, does not appear in England to be very clearly defined, unless this has been accomplished by recent statutes. It is always exercised by committees appointed by the Chancellor, who are nothing but bailiffs, receiving the rents and profits from the property of the lunatic (In re Fitzgerald, 2 Sch. & Lefroy, 437), to manage for his best interests, under the constant superintendence of chancery. The powers of the great seal or its delegate at common law, extended no further than the disposition of the personal estate of the *non compos*, and of the rents and profits of his real estate; not extending to any species of alienation or conversion of the latter. Before the recent English statutes referred to enabling the Lord Chancellor to order the estates of lunatics to be sold or leased, it was held, that an order in lunacy for such purpose, did not give any title to a purchaser, but only a right of enjoyment during the lunacy of the party whose right was affected: Ex parte Dykes, 8 Ves. 79. Possessing, therefore, no power to convert the real assets of a lunatic into money, and thus to administer them equitably among his creditors, chancellors did not think it proper to interfere with an execution issued by a creditor and levied on such assets. This is shown by the case of Ex parte Dyke, 8 Vez. 79 (1803), where Lord Eldon, after regretting his want of authority to authorize an absolute lease of a lunatic's estate, in order to raise funds to pay his debts, declared that if the creditors took his leasehold estates in execution he could not restrain them. This case arose under a petition from creditors, praying that the Master's report of debts due the petitioners be confirmed, and the committee authorized to sell so much of the personal and leasehold estates as should be sufficient to pay the lunatic's debts. As to the right of the Chancellor to so appropriate the personal estate of the lunatic no question was made, the difficulty only arising

in respect to his real assets. The hesitation therefore to interfere, arose from the want of competency in the Chancellor to apply the capital of the real estate of the lunatic to his support, or the payment of his debts; and hence it became inequitable to intercept the creditor's common-law remedy by execution, where chancery could furnish him no substitute for the enforcement of his claim.

Over the personal estate of a lunatic a broader authority was extended, and this was appropriated to the equal payment of his debts, first, however, securing to him, even against his creditors, a sufficient maintenance. How this jurisdiction was exercised, is shown in Hastings, Ex parte, 14 Vez. 182 (1807), where a petition was presented by the wife and committee of a lunatic, praying that his debts, some of which were by *specialty*, others by simple contract, might be paid out of a fund of £5000 in bank, upon the suggestion that the creditors would arrest him. " I have no authority" (said Lord Eldon) " to pay the debts of a lunatic, unless I see that it is for the accommodation of his estate; I cannot pay his debts and leave him destitute. There is no instance of paying the debts of a lunatic without reserving a sufficient maintenance for him, *as the creditors cannot touch these funds*. They may put him in gaol, but I can maintain him there."

It may have been, and probably was, the fact, that the funds were in bank, to the credit of the Court; and hence not subject to execution, being in *custodia legis*. Such funds creditors could only reach through an application to the Court for equitable relief, which would of course only be granted on equitable terms. But to this may be answered, if a reason of this kind is interposed against the application of the authority of Ex parte Hastings to a case like the present; that the property of a lunatic in the hands of a bailiff and receiver of the Court (for such, and no more, is every committee) is as much in *custodia legis* as if deposited in bank to its credit, or locked up in the strong box of the Court, under the care of its officer. All these would be but depositories of the Court, and over the property, in either situation, chancery ought to exercise the same guardianship, and impose the same equitable restraints, on any creditor seeking to satisfy himself from it. If this view of the case of Ex parte Hastings is correct, it is authority to show that creditors in England, even before the recent statutes, were not permitted to reach the personal estate of the lunatic, in order to coerce the payment of his debts, except by the permission of chancery. The same inference is fairly deducible from Ex parte Dykes, 8 Vez. 79, if carefully considered with regard to its circumstances, and the reasons assigned by the

Chancellor for the conclusions finally arrived at by him. For, although Lord Eldon, the same Judge who ruled Ex parte Hastings, held, he *could not restrain* the creditor from taking the leaseholds in execution, he comes to this conclusion because of his want of power to sell it himself and apply the avails of such sale to the payment of the lunatic's debts. It would seem to follow, that where the power of chancery is plenary, as it undoubtedly was then, and is now, to apply the mere personal effects of a lunatic to the payment of his debts; that chancery *would* restrain any creditor from monopolizing them by execution. The reason which induced Lord Eldon to refuse to restrain the levy of the creditor on land, was the inadequacy of the Court to turn it into money, and administer such money to the payment of debts. This reason does not exist as to personal assets, and hence a different conclusion is required. This view seems to harmonize the cases, and makes them important aids in the final solution of the case before us. The cases on this subject are neither numerous nor clear in the English Chancery books. This probably arises from the qualified nature of their jurisdiction over the property of lunatics. For it was not until the statutes of 43 Geo. 3, ch. 75, of 9 Geo. 4, ch. 78, and finally of 11 Geo. 4 and 1 Wm. 4, ch. 65, that the English chancery had power to sell, mortgage, or lease the property of a lunatic for the payment of debts, or discharge of encumbrances.

In connexion with this subject, Chancellor Kent (Executor of Beecher *v.* Van Cortland, 2 John. C. 246) observes, that from the limited nature of the authority of the Court of Chancery in England, over lunatics, previous to 43 Geo. 3, the cases there are not quite applicable to the New York tribunals. The force of this remark will hereafter be seen to be applicable to our own. "The custody of the lunatic is committed in England," says he, "not to the *Court of Chancery*, but to an individual selected by the Crown, who is generally, though not always, the person who has the custody of the great seal. But here the charge of the estate of the lunatic and his maintenance is expressly committed to the Chancellor (N. R. Laws, vol. 1, 147), and the duty of providing for his maintenance is specially enjoined. For this purpose the committee is to exhibit on oath, within six months from his appointment, an inventory of the estate, debts, and credits of the lunatic: and when the personal estate shall be insufficient for the discharge of the debts, he is to present a petition to the Chancellor, setting forth the particulars and amount of the estate and debts. If the personal estate shall appear to be insufficient, it is made the duty of the Chancellor

to cause so much of the real estate to be sold as shall be necessary for the discharge of the debts. These provisions render the payment of the lunatic's debts no longer a matter of discretion, but of indispensable duty; and they contemplate the committee as being charged (though undoubtedly under the control and direction of this Court) *with a trust* to be performed for the benefit of creditors, and *an agency* in the payment of the debts and the administration of the estate." In carrying out the jurisdiction given by this statute, the New York Chancery has gone the full extent prayed for by this petition. Thus in Ex parte Heller, 3 Paige, 199, the Chancellor observed, that "If any person has a legal or equitable claim against the estate which is under the care and management of the committee, who refuses to allow the same, he must apply to this Court by *petition* to enforce his claim, and he *cannot* be *permitted* to obtain payment by means of a suit at law, except where the suit is brought under the direction of this Court. Although the lunacy of the defendant may not always form a legal defence, this Court, upon proper application by the committee, will *restrain such a proceeding*, and compel the plaintiff to come here for justice. And even if a party succeed in an action at law, it will be a *contempt* of this Court for him *to interfere with the property* which is under its exclusive control. Although he may afterwards come here for the payment of his claim, he must again establish it in such manner as this Court may think proper to prescribe." In Ex parte Hellings, 5 Paige, 489, the Court stayed proceedings in suits against a lunatic, commenced after inquisition found; though it declined interfering summarily where judgment had been obtained and *executions issued* before the proceedings in lunacy. "After the appointment of a committee," says Chancellor Walworth, in the case, "no creditor can be permitted to interfere with the property in the hands of the committee, without the permission of the Chancellor or Vice-Chancellor having jurisdiction of the case. Any sheriff who should *attempt to levy upon the property* of the lunatic under such circumstances, *would be punished* as for a contempt of Court." In the earlier case of Brasher *v.* Van Cortland, 2 John. C. 402, Chancellor Kent declared, "that the fit and proper remedy for the creditor of the lunatic is in this Court, and not by action at law. The commitment by statute of the case of the lunatic and his estate to this Court, *and the power given to it to sell the real estate*, shows that this is the proper tribunal to resort to." In New York, therefore, an execution like this, issued nearly eight months after the defendant has been found lunatic, and his estate

and person placed in the care of the agent of chancery, would never be permitted to be levied on his entire personal estate, to the destruction of the interests of other creditors. The extent of this protecting power of the Court, Chancellor Kent regards as a necessary consequence of their unlimited control over the estate, and the statutory obligation on the Court to appropriate it to the payment of creditors. (See Brasher v. Van Cortland.)

Is there anything in our laws which makes this wholesome and saving doctrine of New York equity a necessary alien to our system? A comparative view of the New York statute " of the custody and disposition of the estates of idiots, lunatics, persons of unsound mind, and drunkards," (1 Revised Stat. 813), and our Constitution and Act of Assembly " relating to lunatics and drunkards," (Pamph. Laws, 1835–6, page 589), will show such a conclusion not to be well founded. Thus, by the first section of the New York statute, the care and custody of lunatics, &c., is given to the Chancellor, who is to provide for their safe keeping and maintenance, and the maintenance of their families, and the education of their children, out of their personal estate, and the rents and profits of their real estate. Our jurisdiction is derived from the Constitution; and our Act of Assembly gives the management of the real and personal estate of lunatics and drunkards to the committees appointed by us; and directs them from time to time to apply so much of the income thereof as shall be necessary to the payment of their just debts and engagements, and their support, and that of their families, and for the education of their minor children. If such income is not adequate for these purposes, it authorizes the committees, under the direction of this Court, to apply so much of the principal of the personal estate as may be necessary. Again, in New York, where the personal estate is inadequate to the payment of the debts of the lunatic, &c., the committee is to apply by petition to the Court for authority to mortgage, lease, or sell so much of the real estate as may be necessary for this purpose. Such petition is to set forth the amount of the estate, real and personal, the application of the personal estate, and the debts and demands existing against the estate. Such petition is to be referred to a master to report upon it. Upon the confirmation of the report, an order to mortgage, sell, or lease, is made, and the Court is authorized to require additional security from the committee making such sale, &c.

Under our Act, if the personal estate is not sufficient for the maintenance and payment of the debts of a lunatic, this Court is '

authorized to make, on the petition of the committee, an order for the sale or mortgage of such parts of his real estate as we shall deem expedient. Similar exhibits are to accompany such application; a similar reference may be made to an auditor to report upon the propriety of the proposed sale; and similar security for the faithful application of the moneys raised is to be required by the Court. It is, however, a briefer process to point out the differences between the two systems, than the identities. I speak now of differences and identities in reference to the. immediate subject before us, for our Act is a much more extended and more complete enactment in reference to lunatics than the New York statute. The difference between the two systems most essential, is that found in the 45th section of our Act, which directs that any writ for the commencement of an action against a person found lunatic, shall be served on the committee of the estate of such person, and that "proceedings may be thereupon had in like manner, as if service had been made on the defendant being of sound mind." Independent of this section, we could not have hesitated in adopting the principles of the New York Chancery, in the administration of the estates of lunatics and drunkards. Is this section to be construed as giving a creditor merely a right to have his demand ascertained at law; or does it give him, when his claim is thus ascertained, the right to obtain by execution a priority over less urgent creditors, and to take from the care and guardianship of the Court, the whole or part of the lunatic's estate, as one or the other may be required to satisfy such demand when it has passed into a judgment? If the former construction is adopted, the whole system will work in harmony with abstract justice; if the latter, the functions of this Court in lunacy become nullified, and a flood of evils must rush in upon us.

By the former construction we proclaim, first, that all the assets equitable and legal of a lunatic are in the first instance applicable to the payment of his just debts; and second, that any creditor, where his demand is disputed, may litigate it at law, after due notice to the committee of the estate; and finally, when all claims against the lunatic are duly ascertained, they are to be paid wholly or rateably by the application of all his estate for this purpose, preference only to be given to such creditors as have specific or general liens on the estate, created before the lunacy has been legally established. By recognising the right of such creditor to issue execution on a judgment after inquisition found, and of levying such execution, not only on the real estate of a lunatic, on which it may be a specific or

general lien before such finding, but on the general personal estate of the lunatic, we produce results so disastrous, that no equitable tribunal should permit them to happen, unless the necessary consequents of positive law. To declare the whole estate, real and personal, of a lunatic liable to the execution of the first creditor who can obtain judgment against him, is to invoke a race for priority among the creditors of one whose sufferings, under the most afflicting of the visitations of God's providence, entitle him to the most kindly consideration of his fellow man. It leaves the more humane creditor no alternative between entering into the struggle or losing his debt, where the estate of the lunatic is not fully adequate to meet the execution of each successive creditor who brings suit. It would multiply litigation by turning every demand against a lunatic's estate into an action at law, where the doubts or fears of creditors should induce them to make the effort for priority, the costs and expenses of which must of course be borne by the estate of the lunatic, and so far depreciate the fund left for his support, and that of his afflicted family, if any he has. It would render the guardian care of this Court over the estates of lunatics almost valueless, and would neutralize that grand element of equity, equality. If, on the contrary, should we adopt that construction of the 45th section of the Act relative to lunatics, which gives any person claiming to be the creditor of a lunatic, the *absolute* right of having his claim ascertained by a trial by jury, and then leaves him, as to the means of obtaining payment, in the same position as all other creditors, equally meritorious, perfect justice is done to all, and unjust preference is given to none. That such was the general policy of the Legislature, may be gathered from another part of the Act. I mean that part which provides for the case of lunatics not found such by inquisition, when in actual confinement. There, after certain proceedings provided by law have been had, such lunatics are to be discharged from confinement as insolvent debtors, and any property they may have is vested in assignees, with like effect as if an assignment had been made by such lunatic when in sound mind, under the Insolvent Laws. The property of such lunatic is distributable equally among his creditors. The opinion, therefore, that we have arrived at, favourable to the objects of this petition, places the property of the lunatic, found so by inquisition, in the same course of administration as that prescribed by the Legislature, where the fact of lunacy has not been ascertained. Nor does it leave the 45th section wholly inoperative, as might be at first supposed. It secures to

the creditor the *absolute right* of trying the validity of his claim by jury, if disputed in the form of an action against the lunatic, with notice to his committee; whereas, in the administration of lunacy by Courts of Chancery, no suit can be brought against a lunatic without first obtaining the permission of the Chancellor: 3 Paige, 199. And even if brought without such assent, and not arrested by injunction, a judgment obtained in pursuance of it does not conclude the Chancellor's right of looking into the merits of the claim, who will still require the creditor to establish it in such manner as he may prescribe, before permitting him to participate in the assets of the lunatic: 3 Paige, 399. On the contrary, a suit brought against a lunatic, and prosecuted *bonâ fide* to judgment, under the provisions of our Act of Assembly, would be conclusive on us as to the amount and merits of the plaintiff's demand. Considered in this point of view, the 45th section of the lunacy act gives a valuable right to all creditors, viz. a right to a trial by the due course of the common law, for the ascertainment of their claims against the lunatic; while, if we give this section the effect invoked by this execution plaintiff, we injure *all* the creditors for the benefit of one, by aiding him in obtaining a preference on a fund which should be the common and equal fund of all; and this, too, while that fund is in the hands, not of the lunatic, but of one whom Chancellor Kent calls the *trustee* of the creditors, and the agent of the court: 2 Johns. C. 402. In the case of the death of the debtor, no creditor has the right to gain any priority over others by speedy suit and execution. Why should this be permitted in the case of the estate of one who physically exists, but who, mentally and morally, is dead? All general principles of equal justice: all analogy, drawn as well from the particular law under consideration as from the established principles of Pennsylvania jurisprudence, are against such a result.

On the whole case, I am of opinion that it is not competent for any creditor of a defendant, found lunatic by due course of law, to issue and levy an execution on his personal property in the hands of the committee appointed by this Court; but that the sole remedy of such creditor against the personal estate of a lunatic, found such by inquisition, in order to obtain payment of his debts, is an application to this Court, who will require the committee to raise the necessary funds from the lunatic's estate for this purpose. It is unnecessary to express any opinion as to the rights of creditors, who have either special or general liens on the lunatic's estate, created while sane, and previous to inquisition found. That the

liens of such creditors are not affected by the proceedings in lunacy, is undoubted, although, perhaps, a question may be raised in a proper case, *how* such creditor, after inquisition found and committee appointed, is to proceed to the enforcement of his liens. According to the practice in lunacy, an injunction may issue on petition of the committee without bill: Ex parte Halleck, 7 John. C. 24. An injunction must therefore issue, restraining the further proceedings of the administratrix of Peter Hertzog, under her execution.

For a confirmation of the doctrine laid down by the Court in this case, see Wright's Appeal, 8 Barr, 59.