### B. I. ARNOLD, RECEIVER, ET AL. V. BEATRICE ELLIS ET AL.

Decided January 11, 1899.

**1. Resulting Trust.**

To create a resulting trust in one whose money is paid for or converted or appropriated to the purchase of property, legal title to which is taken in the name of another, such money must be so used at the time of the purchase and as a part of the original transaction.

**2. Same.**

No oral agreements before or after the title is taken will create a resulting trust.

**3. Same.**

A father sold land of his daughter without her knowledge, giving bond to make title, and invested the proceeds in other land, taking title thereto in himself. Subsequently the child conveyed the land so sold in discharge of her father's bond,—he stating that the land bought with the proceeds should be hers. Held, that no resulting trust in her favor, in the property so purchased, arose from the transaction, and the express trust was void by the statute of frauds.

**4. Practice on Appeal—Rendering Judgment.**

Under Revised Statutes, article 1027, the appellate court is governed by the record in determining whether judgment shall be rendered for appellant on reversal, and can not consider statements or affidavits showing that evidence, not appearing in the record and which might require the cause to be remanded, was offered on the trial.

APPEAL from Bell.  Tried below before Hon. JOHN M. FURMAN.

*Banks & Cochran* and *Henderson & Streetman,* for appellants.

*Harris & Saunders* and *A. M. Monteith,* for appellees.

KEY, ASSOCIATE JUSTICE. — Appellees, Beatrice Ellis, joined pro forma by her husband, E. I. Ellis, and Bessie McKenzie, a minor suing by her next friend, E. I. Ellis, instituted this suit against A. McKenzie, B. I. Arnold, receiver of the Bell County National Bank, P. M. Kolb, and H. F. Iglehart for title and possession of lot No. 2 in block No. 9, in the city of Temple, Bell County, Texas.

The defendant McKenzie filed no answer, and judgment by default was rendered against him.  The defendant Arnold pleaded a general denial and not guilty, and especially alleged title in himself as receiver of the Bell County National Bank, the particulars of which it is not necessary to state.  The defendants Kolb and Iglehart disclaimed as to all the lot except the north half thereof, which is described by metes and bounds in their answer; and as to said north half they pleaded a general denial and not guilty.

There was a jury trial resulting in a verdict and judgment for the plaintiffs against all the defendants for all the land sued for.  The defendants Arnold, Kolb, and Iglehart have appealed.

The testimony submitted by the plaintiffs, by which they claim title to the property in controversy, is as follows:

1. Deed by W. S. G. Wilson to Beatrice McKenzie for fifty acres of in the John Hobson survey, in Bell County, Texas, dated March 26, 1882, and recorded in the deed records of Bell County, Texas, on 21st of December, 1882.

2. Deed by W. S. G. Wilson to Bessie McKenzie for fifty acres of land in the John Hobson survey, in Bell County, Texas, dated March 26, 1882, and recorded in the deed records of Bell County, December 21, 1882.

3. Defendants admitted that Beatrice and Bessie took good title under said conveyances to the respective tracts.

4. Bond for title executed by A. McKenzie and wife to J. M. Woodward, for the two above mentioned tracts of land, dated January 2, 1886, and recorded in the deed records of Bell County, Texas, on January 18, 1886.  Obligation and consideration as follows: "I, A. McKenzie and wife A. E. McKenzie are held and firmly bound unto J. M. Woodward in the sum of one thousand dollars.  The condition of the above obligation is that, whereas the above bound A. McKenzie and wife A. E. McKenzie have this day sold to said Woodward, his heirs and assigns, the following described real estate (two tracts described by metes and bounds).  The consideration paid and agreed to be paid for the said land is as follows: Eight hundred dollars in cash, receipt of which is hereby acknowledged; two hundred dollars payable August 1, 1886; five hun-

dred dollars payable two years from this date, as evidenced by two prom-
issory notes for the above amounts, said notes bearing 10 per cent inter-
est from date. Now, if the said J. M. Woodward shall fully pay said
indebtedness according to the legal tenor and effect thereof, the said A.
McKenzie and wife A. E. McKenzie shall make or cause to be made to
the said Woodward, his heirs and assigns and legal representatives, a
good and valid title to said premises, then this obligation shall be null
and void, otherwise to remain in full force and effect.

5. Deed by Beatrice Ellis and husband, B. I. Ellis, to J. M. Wood-
ward, conveying the 50 acres conveyed by Wilson to said Beatrice, dated
January 1, 1892, and recorded in the deed records of Bell County, Jan-
uary 27, 1892. Consideration as follows: "One thousand to us paid
and secured to be paid by J. M. Woodward, as follows: six hundred dol-
lars in cash, the receipt whereof is hereby acknowledged, and the execu-
tion by the said J. M. Woodward of his certain promissory notes of even
date herewith, payable to the order of Beatrice Ellis at the first Na-
tional Bank of Fort Worth, Texas, January 10, 1892, for the sum of
four hundred dollars, with interest from date until paid at the rate of 10
per cent per annum, and providing for attorney's fees of 10 per cent ad-
ditional on account of principal and interest then due as attorney's fee."

6. Deed from W. R. Branch to A. McKenzie, for lot 2, block 9, of
Temple (the property in suit), dated June 20, 1887, and recorded in the
deed records of Bell County on November 14, 1887, consideration, "$50
to me in hand paid and $750 to be paid in fifteen monthly installments
of fifty dollars each, as shown by notes," etc.

A. McKenzie, by deposition, testified: My name is A. McKenzie; am
48 years old; Beatrice Ellis and Bessie McKenzie are my daughters. I
am the same McKenzie who bought lot 2, block 9, of Temple, from W.
R. Branch. I paid $800 for the property,—$50 cash, and gave fifteen
promissory notes for $50 each for the balance, payable monthly. A part
of the money paid for said property was my own and a part belonging
to my daughters. I knew J. M. Woodward; he is the same person who
bought the land on the Hobson survey from my children. He succeeded
me in possession of the property. My children received consideration
from Woodward. Of course, I handled the money for them. I sold no
land on the Hobson survey to anyone, but my daughters Beatrice and
Bessie did sell 100 acres in this survey to Woodward, the same being all
they owned therein. They received $15 per acre. The object my daugh-
ters had in selling was to buy a home in Temple, and a part of the money
realized in the sale to Woodward was invested in the property in contro-
versy. I do not recollect the exact amount, but the greater part of the
purchase money came from the sale of the Hobson land. Bessie is still
a minor. As yet there is no settlement between me and my children."

Cross-examination: "At the time I purchased the Temple property
from Branch, I was a locomotive engineer on the Santa Fe Railway.
Held that position about two years. Salary averaged less than $100 per
month. I bought the property mostly on time. It is not true that all

the purchase money from the lot came from my earnings, but it is true that a part did. I do not know how much, as I kept no record. When I sold Woodward, he paid the consideration, as stated in the bond for title, a part in cash and the balance afterwards paid according to the bond. The deed to the Temple property was made direct to me. I gave a lien on the south one-half to the Waco Building and Loan Association. The property was in my name and the children were not mentioned in the lien. It is true that I gave two deeds of trust to Kolb and Iglehart to secure them as sureties on my bond, and I told them the property was mine."

Sixteenth cross-interrogatory: "Is it not true that afterwards you deeded said property to them, and did you not represent to them that you owned it and had the right to sell it?" Answer: "Yes. The deed to the property was in my name. Yes, I rendered the property for taxation in my name, but not under oath. I took the deed to the Temple property in my own name because I thought it best to do so. I kept the money I got from Woodward with my other money. I used the money—the money belonging to the Baker minor—to improve the north one-half of the Temple lot. I do not know that my children have made any ratification of my sale on the Hobson land. I have never made a deed or conveyance to Beatrice Ellis and Bessie McKenzie, or to either of them, for said lot."

Harry Billings testified: "I have known A. McKenzie since 1868, and Beatrice Ellis and Bessie McKenzie all their lives. He married about 1875. He then lived at Hearne and worked for the railroad. He was living in Temple about 1886. I lived with him part of the time in Temple. I know when he sold the two tracts of land on the Hobson survey, belonging to his children, to J. M. Woodward. He got $1000 down in cash. I do not know what he did with the $1000. I know that he paid for the property in controversy out of the money he got from Woodward. He told me he bought the Temple property with it. He never saved much out of his salary above family expenses. He got $1000 down when he sold to Woodward."

Cross-examination: "I live in Monterey, Mexico. I left there last Friday to come to this trial to testify. Miss Bessie McKenzie came with me. McKenzie lives in Monterey and is working for the railroad, and I am working under him. McKenzie did not pay my way. He told me the case would be tried to-day and that they wanted me to come, and I told him I would come and he gave me a leave of absence. I do not draw pay while I am absent."

John J. Stephens testified: "I know the land on the Hobson survey that McKenzie sold to Woodward. Woodward, I think, paid McKenzie $1000 at the time of purchase. When Mrs. Ellis and husband conveyed to Woodward, $500 was paid to McKenzie by Woodward."

Mrs. Beatrice Ellis testified: "I am the daughter of A. McKenzie; was married in the year 1891 to E. J. Ellis. On the —— day of ————, 1892, I made a deed to J. M. Woodward to 50 acres owned by me in the

John Hobson survey. I made a deed because my father asked me to. He told me that if I would sign the deed I could have the property in Temple. I did not know that my father had sold the 50 acres to Woodward until the time he asked me to make the deed to Woodward. I made the deed for the purpose of ratifying and making the title good to Woodward. Woodward did not pay me any money and did not give me any notes. My sister Bessie and myself are in possession of the land in controversy in this suit, except the north one-half, which is in the possession of Iglehart and Kolb. My father told me that he gave $800 for the Temple property. He sold the land on the Hobson survey and bought the Temple property with a part of the proceeds, using (so he told me) $800 of the proceeds for that purpose. B. I. Arnold was put in possession of the property in controversy—the south half—by the United States marshal, and held possession, and we got possession then by suit in justice court, and have been in possession ever since."

Cross-examined: "I did not know that my father had used the money he got from Woodward to purchase the Temple property until he asked me to sign the deed, in 1892, from myself and husband to Woodward, and he told me that if I did so the Temple property would be mine, as he had used the money he got from Woodward for the farm to buy it with. My sister Bessie and myself lived with my father and mother as members of the family until my marriage, and then I moved away. My husband rented a house in Temple about a year, and for a while we boarded at the Steagall House. We moved to Cameron, and it was while living at Cameron that I signed the deed to Woodward. When we moved back to Temple we rented the southeast corner house on the property in controversy and lived in it about three months. We rented it from my father and I paid him the rent. This was in the spring of 1892. I think I paid half the rent, and another family that lived in the house with me paid the other half. I did not know anything about my father having mortgaged a part of the premises to the Waco Building Association. My mother died in 1894, and she had no children except Bessie and myself. I was 11 year old in 1886, when my father, A. McKenzie, made the bond for title to Woodward to the Hobson land."

Bessie McKenzie testified: "A. McKenzie is my father. He now lives in Monterey, Mexico. He has been living there for two years. I have been living in Temple all the time. When he left, he left me in possession of the south half of the property, and I have been in possession ever since. My mother died in 1894, and since that time I have looked out for myself and made my own support. The Temple property was bought with money paid by Woodward for the farm on Hobson's survey. I did not know this until the time my sister signed the deed to Woodward. I have been visiting my papa since he moved to Monterey, but left my furniture in care of my sister and in the house. Nobody has received the rents for the south half except my sister and myself. I was 20 years old last February. I have been in possession of the south half of the land in controversy ever since my mother died, in 1894, except for about one

month, during which the defendant Arnold was in possession. He was put in possession by the United States marshal, and I was put back into possession a month afterwards.

Cross-examined: "I remember very little about living on the Hobson survey or moving away. I was quite young. I do not remember whether I ever made a deed to Woodward for the Hobson land or not; if I did, it has been so long ago that I have forgotten it. If I never signed the deed, I understand that I own the Hobson land now. I was 8 years old in 1886, when my father, A. McKenzie, made the bond for title to Woodward to the Hobson land. I do not claim the land my father and mother sold to Woodward out of the Hobson survey, but I claim the Temple property in controversy."

E. J. Ellis testified: "Myself and wife signed the deed to Woodward for the Hobson land at Major Lyle's house in Cameron. McKenzie stated that he had sold the Hobson land to Woodward and bought the Temple property with the money, and that the girls could have the Temple property in place of the farm. Bessie never executed the deed."

The defendants Arnold, Kolb, and Iglehart introduced testimony showing that they had acquired title to the property through and under the defendant A. McKenzie. And the defendants Kolb and Iglehart introduced testimony tending to show that they acquired their interest in the property for a valuable consideration and without notice of the rights of the plaintiffs; and, as we hold that the plaintiffs' testimony shows no title in them to the property, we deem it unnecessary to state in detail the titles relied upon by the defendants, nor to determine what would be the legal effect of such titles had the plaintiffs shown titles in themselves.

The court below instructed the jury to find for the plaintiffs if they believed from the testimony that A. McKenzie, being the father of the plaintiffs, sold their land on the Hobson survey to Woodward, and mixed and mingled the money received therefor with money of his own, and with money so confused and mingled paid for the lot in controversy, and that the plaintiffs had acquiesced in and ratified the action of A. McKenzie in so doing. The charge also instructed the jury to find for the defendants if they believed from the testimony that the property in controversy was not so acquired, but was acquired with the separate funds of A. McKenzie.

The defendants requested and the court refused the following special instruction:

"If the land in controversy in this cause was bought by A. McKenzie and paid for by him with money belonging to plaintiffs that had come into the possession of the said McKenzie, then a resulting trust in said land would arise in favor of plaintiffs, and though the deed to said land was taken in the name of said McKenzie, the beneficial title would be in plaintiffs and they would be entitled to recover said land. But, in this connection, you are charged that such trust, to arise at all, must arise at the time of the transaction itself; that is, at the time said McKenzie put such money into said land and took the deed thereto, and no subsequent

and entirely independent conduct or agreement on the part of said Mc-Kenzie or plaintiffs would raise such trust. And in this connection you are also further charged, that to entitle plaintiffs to the beneficial interest or title to said land, or to recover the same on account of the money paid therefor by said McKenzie being their money, you must believe, from the preponderance of all the evidence and facts and circumstances in evidence before you, that the money that paid for said land belonged to plaintiffs at the time it was so paid for said land.

"And in this connection you are also further charged, that if the lands in the Hobson survey conveyed to the plaintiffs (separately) by W. S. G. Wilson were the property of plaintiffs, and the title thereto in plaintiffs, and that said McKenzie executed the bond for title thereto to J. M. Woodward, in evidence in this cause, and received the money from said Woodward, and with said money so received from said Woodward, bought and paid for the land in controversy and took the deed thereto in his own name, said purchase and payment of said money for said lands would not raise any resulting trust in said lands in favor of plaintiffs, nor create in them any beneficial interest therein, and no subsequent act on the part of said McKenzie or plaintiffs, or ratification on the part of plaintiffs, would have the effect to raise such trust."

*Opinion.*—By proper assignments of error, objections are urged to the court's charge and its refusal of the special charge set out above. These objections are well taken, and the principles of law upon which they are based are fatal to the plaintiffs' case.

As contended by counsel for appellants, to create a resulting trust in favor of one whose money is paid for property and the legal title taken in the name of another, or whose property or funds have been converted or appropriated to the payment for or purchase of property, the legal title to which is taken in the name of one other than from whom the consideration emanated, it must appear that the consideration was paid or money used at the time of the purchase and as a part of the original transaction, and no subsequent and entirely independent conduct, intervention or payment will raise any resulting trust. The trust must result, if at all, at the time the deed is taken and the legal title vests in the grantee. No oral agreements and no payments made before or after the title is taken will create a resulting trust; and such trust will not exist unless the transaction is such at the moment the title passes that the trust will result from the transaction iself.

The plaintiffs' title rests upon the erroneous theory, that the money used by A. McKenzie in paying for the property in controversy belonged to them; but such was not the case. If it be conceded that the entire consideration paid by McKenzie for the lot was the proceeds of the sale of the Hobson land to Woodward, still, it was not the plaintiffs' money, and they had no interest in it. Although McKenzie was their father, he had no authority whatever to sell their land, and when he undertook to do so, the instrument executed by him and the receipt by him of the pur-

chase money from Woodward did not in the slightest degree affect their title to the land, and they acquired no interest whatever in the consideration received by McKenzie. Therefore, as the consideration paid by McKenzie for the lot in controversy belonged to him, and not to the plaintiffs, there was no resulting trust in their favor; and, so far as they are concerned, McKenzie acquired both the legal and equitable title to the lot. Nor is the plaintiffs' case benefited by their alleged ratification of their father's act in contracting their land to Woodward. Leaving out of consideration the facts that the bond for title does not purport to have been executed by A. McKenzie as their agent or guardian, and that they were both minors of tender age, it is clear from the testimony that they did nothing in ratification of the transaction referred to until long after McKenzie acquired title to the Temple lot. They both testified they were not apprised of their father's attempt to sell their land on the Hobson survey until 1892; and he bought the Temple lot in 1887.

Therefore, not having ratified his sale of their land to Woodward while he held and owned the money received from Woodward, and not having done so, if at all, until after he acquired title to the Temple lot, no resulting trust in the lot arises in their favor.

The subsequent agreement between McKenzie and the plaintiffs, that they should have the property in controversy in lieu of the Hobson land, not being in writing, is in contravention of the statute of frauds, and therefore void. The following authorities cited in appellants' brief are more or less in point, in support of the views we have announced: Evans v. Opperman, 76 Texas, 298; Parker v. Coop, 60 Texas, 118; Lacey v. Clements, 36 Texas, 663; Torrey v. Cameron, 73 Texas, 588; Williams v. County of San Saba, 59 Texas, 442; Oury v. Saunders, 77 Texas, 278; Toole v. Dibbrell, 29 S. W. Rep., 387; Beach Eq. Jur., secs 215, 217, 219; Pom. Eq. Jur., sec. 1037; Beach on Trusts and Trustees, secs. 150, 151, 175; Bisp. Prin. of Eq., secs. 79-83; Perry on Trusts, sec. 133; Hadley v. Stuart (Iowa), 17 N. W. Rep., 500; Botsford v. Burr, 2 Johns. Ch., 405; Cutler v. Tuttle, 4 N. J. Eq., 562; Tunnard v. Littell, 23 N. J. Eq., 267; Rogers v. Murray, 3 Paige, 390.

In Parker v. Coop, supra, the court say: "That the trust must result, if at all, at the instant the deed is taken and the legal title vests in the grantee. No oral agreement and no payments before or after the title is taken will create a resulting trust, unless the transaction is such, at the moment the title passes, that the trust will result from the transaction itself."

In Evans v. Opperman insurance policies had been issued upon the life of Opperman. Opperman died leaving two sets of children. One set of children collected the money due on the insurance policies, and the child of the other wife brought suit against those who had collected the insurance claiming that he had an interest therein and was entitled to his proportion of the money received by them from the insurance company. The court said: "Admitting all this to be true, it is not clear that any money has been due to the plaintiff. If he was entitled to part

of the money the insurance companies still owe it to him, and the actions of the defendants have not deprived him of any right. If they had held the legal title to the money and he had owned a beneficial interest in it, his right to sue them would have been clear; but, in the absence of any other beneficiary relation or any privity of contract between the parties and of the deprivation of any right which he had, it is difficult to see that he has a cause of action against them, according to the facts stated in the petition."

In Hadley v. Stuart, supra, the plaintiff's father (Amos) inherited, under a will, certain property in Indiana. The plaintiff's grandmother (Debora), being the mother of Amos, plaintiff's father, executed a bond for title to the property, received the purchase money, and reinvested it in land in Guthrie County. The plaintiff's father was at the time a minor, and after he became of age he executed a deed to the Indiana property, upon the representation of his mother that she had used the money which she had received for the land in the purchase of the Guthrie County land, and that she held the same in trust for him. Amos died, and the plaintiff inherited whatever right he had in the land. In a suit involving the title to the Guthrie County land, the plaintiff asserted title on the ground that the transaction recited created a resulting trust in favor of his father. The court, after holding that the plaintiff's grandmother had no power to convey his father's interest in the Indiana land, said:

"As, then, her sale and conveyance carried no interest other than her own, and was not understood to carry any other, the money paid her, other than for her interest, was paid her for her bond. Whatever interest, then, Amos, through whom the plaintiff claims, had in the land, that interest remained in him after Deborah's sale of same, as before. Having been divested of nothing by Deborah's transaction, he acquired nothing by it. He acquired no interest in the money paid her; it was all rightfully hers, and she needed it to enable her to protect herself against her bond; she had yet to procure a complete title to be made at her expense. The matter stood in this way until Amos became of age and until some years after Deborah purchased the land in her name in Guthrie County which the plaintiff is seeking to reach. When Amos became of age he was applied to for a deed to his interest in the Indiana farm. For reasons satisfactory to himself, he was induced to give the deed. Up to that time he could have had no interest in the Guthrie County land by reason of his interest in his father's estate, because that interest had remained intact in the Indiana farm. If, then, he acquired any interest in the Guthrie County land, he acquired it at or subsequent to the time when he parted with his interest in the Indiana farm. The plaintiff's trouble is that in the absence of an express trust created in the real estate in writing, he must rely upon the resulting trust, and under no pretense could such a trust exist except by the use of his father's money in the purchase of the land, but, as we have seen, the money used was De-

borah's, the consideration for it having been furnished by her and her alone."

That case was very similar to this, and both rest upon the same principle of law. Our conclusion is, that the plaintiffs utterly failed to show title in themselves, as against the defendants Arnold, Kolb, and Iglehart, and the court should have directed a verdict and rendered a judgment for said defendants. Such being the case, the statute (article 1027) makes it out duty to comply with appellants' request, and reverse and render judgment for them.

Counsel for appellee object to this being done, and insist that if reversible error is shown the case should be remanded for another trial; and in support of this view, they state in their brief that they offered certain evidence, which was excluded by the court, tending to show that the plaintiffs had acquired title to the property in controversy through a foreclosure sale under a judgment foreclosing a mortgage executed by A. McKenzie on December 19, 1887. There is no bill of exception, or anything else in the transcript showing that such testimony was offered, but appellees' counsel have filed an affidavit with their brief, stating that such was the fact.

We do not doubt the truth of the matters stated in the affidavit, but know of no authority, and have been cited to none, that will authorize us to consider the affidavit in disposing of the case. As an appellate court, we must dispose of cases upon the transcript made by the clerk of the proceedings in the court from which the appeal is taken; and the transcript can not be amended or corrected by affidavits. If appellees offered the testimony referred to and the court refused to admit it in evidence, it was their privilege to reserve a bill of exceptions and have the same incorporated in the transcript; and if such course had been pursued they could have assigned error upon the action of the court in not admitting the testimony and required this court to decide upon its admissibility. The statute cited above declares, "that when the judgment or decree of the court below shall be reversed, the court shall proceed to render such judgment or decree as the court below should have rendered, except when it is necessary that some matter of fact be ascertained, or the damage to be assessed or the matter to be decreed is uncertain, in either of which cases the cause shall be remanded for a new trial in the court below." We think the contingences referred to in the statute, that require a case to be remanded for a new trial, must be indicated by the transcript. and can not be made to appear by original testimony offered in this court to establish facts which, by the exercise of proper diligence, could have been made part of the record. For this reason, we do not feel at liberty to consider the matters stated in the affidavit referred to.

As between the plaintiffs and the defendant McKenzie, the judgment of the District Court will be affirmed; but, as between the plaintiffs and the other defendants, said judgment will be set aside and judgment here rendered that the plaintiffs take nothing as against the defendant B. I. Arnold, receiver of the Bell County National Bank; that the plaintiffs re-

cover of the defendants Kolb and Iglehart that portion of the lot as to which said defendants disclaimed, and as to the remainder of said lot that the plaintiffs take nothing. The costs of both courts will be taxed against the plaintiffs.

*Affirmed in part and reversed and rendered in part.*