### FARMERS' AND STOCKMEN'S STATE BANK et al. v. SWEANEY. '(No. 2629.)

(Court of Civil Appeals of Texas. Amarillo. April 21, 1926. Rehearing Denied June 16, 1926.)

1. **Banks and banking** ⬤⟳15—**Where there was understanding that bank would pay interest on deposit, deposit held interest bearing, and not entitled to protection of guaranty fund (Acts 38th Leg. [1923] c. 45, amending Rev. St. 1911, art. 486; Rev. St. 1925, arts. 446, 447,**

Where bank promised that depositor would not lose by deposit, understood to mean that interest would be paid, although there was no specific agreement therefor, and payment of interest, though for less than entire amount, which deposit might be said to have earned, was made within 90 days of liquidation, deposit *held* interest bearing, and not entitled to protection of depositors' guaranty fund under Acts 38th Leg. (1923), c. 45, amending Rev. St. 1911, art. 486, and Rev. St. 1925, arts. 446, 447,

2. **Appeal and error** ⬤⟳1175(5).

Where evidence does not warrant submission to jury, appellate court will reverse judgment based on verdict and render judgment which should have been entered by trial court in view of Rev. St. 1925, art. 1856.

Appeal from District Court, Ochiltree County; Frank Willis, Special Judge.

Suit by J. W. Sweaney against the Farmers' & Stockmen's State Bank and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Jno. W. Goodwin, of Austin, H. E. Hoover, of Canadian, and Allen & Allen, of Perryton, for appellants.

R. T. Correll and J. W. Payne, both of Perryton, and F. P. Works, of Amarillo, for appellee.

RANDOLPH, J. J. W. Sweaney instituted this suit in the district court of Ochiltree county, Tex., against the Farmers' & Stockmen's State Bank, Chas. O. Austin, commissioner of banking of the state of Texas, Dan Moody, Attorney General of the state of Texas, and W. Gregory Hatcher, state treasurer of the state of Texas, the last three composing the state banking board.

The plaintiff alleged in his petition that the Farmers' & Stockmen's State Bank is a banking corporation, incorporated under the laws of the state of Texas, and operating under the depositors' guaranty fund for securing its depositors; that said bank was closed for liquidation on September 26, 1924, and is being liquidated by the banking commissioner; that at the time said bank was closed he had on deposit therein $12,300, upon which no interest was being paid or contracted to be paid, and which was not otherwise secured than by the guaranty fund;

that, after the closing of said bank, he presented his claim for said $12,300 to the banking commissioner, as a general, noninterest-bearing, unsecured deposit, payable out of the general fund; that the banking commissioner rejected his claim as payable out of the guaranty fund. He therefore prayed for judgment for the amount of his claim, and that it be established as payable out of the guaranty fund.

[1] Appellants filed separate answers, each answer containing a general demurrer, a general denial, and a special answer or plea to the effect that, if plaintiff's claim was not interest bearing at the time the bank was closed, said deposit had theretofore been an interest-bearing deposit, and, if changed from an interest-bearing to a noninterest-bearing deposit, that such change was made in less than 90 days next before the bank was closed, and that, therefore, the same was not secured by the guaranty fund.

The decision of the question presented by this special plea, in our view of the case, disposes of the case, and renders it unnecessary to discuss any of the other questions raised by appellant's brief.

Article 486, Acts of the Regular Session of the Thirty-Eighth Legislature of the state of Texas, page 90, provides as follows:

"In the event the banking commissioner of Texas shall take possession of any bank or trust company subject to the depositors guaranty fund plan of this chapter as herein provided, all the depositors of said bank or trust company as specified in article 448, except as hereinafter provided, shall be paid in full out of the cash in said bank or trust company that can be made immediately available and the remainder shall be paid out of the depositors guaranty fund through the said board in the event the cash available in said fund shall be insufficient; provided, however, that no deposit upon which interest is being paid or contracted to be paid, either directly or indirectly by said bank, its officers or stockholders to the depositor and no deposit secured in any way shall be insured under this chapter. * * * * "

See, also, articles 446, 447, Revised Civil Statutes of Texas 1925.

In order that the facts bearing upon this question shall clearly appear, notwithstanding it burdens the opinion with its length, we quote freely from the testimony of the two principal witnesses:

J. W. Sweaney, plaintiff, testified:

"I live in Missouri. The first visit I made to Perryton, Texas, as well as I remember, was in March, 1922. On my first visit here I did not have any business in or with the Farmers' & Stockmen's State Bank. I had my first dealings with the bank about the first days of June, 1922. I stayed here just a few days on my March trip. I had a son here, and I visited him. He wanted me to go down and look at a farm. When I came back in June, I met Mr. Wilbanks, who is connected with this bank, and had business transactions with him at

---

⬤⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

that time. On my first visit I came down to look the country over, and in June I came back and decided to close up a deal, and I went and talked to Mr. Wilbanks about it. The reason I went to that particular bank was that I had a conversation with Mr. McLarty over here, a real estate man, and a lot of others, and they said that was the bank to do business with, that it was guaranteed by the state, and they advised me what business I did to go to the state bank. So I went in and talked to him about it, and I showed him what I had to deposit. I had these bonds and some air cooler stock, and I asked him then did they take on deposit, and he said, 'We have three ways,' and I asked him what they were, and he said they took it on checking account—he said one way was to put it on checking deposit. Well, I deposited this money I was talking to you about. I deposited $1,300 in cash, the government bonds, and those other things. If they stayed there until they came due, he was to collect them, but I didn't let them stay. I did not have any C. D.'s in any other bank at that time. I left $1,300 there at that time, and I asked him about the rate of interest, and he said they could afford to pay 6 per cent. on time deposits or on daily balances, but, he said, 'The state isn't responsible for it.' I says, 'Then I will deposit my money on checking deposit,' and I walked out. He took my deposit, and I walked out, and he walked around behind the counter and made a remark to me: 'Mr. Sweaney, if you don't use your money, and it stays here any length of time, I will see you don't lose anything.' He says, 'My money is my own, and I can do as I please with it. I can give it to you or do as I please with it.' That was about the substance of what occurred between Mr. Wilbanks and me on that visit. I have forgotten how long I remained in this country on that visit, but I believe, though, until September, I am not sure. My son was still living here, but I won't say how long that was.

"I never had any further talk with him about the matter on that visit, but I went back home and came to Perryton again Christmas and stayed a few days, and I saw Mr. Wilbanks on that trip. I stayed all night with him, but I did not discuss the matter of deposit or interest on that trip. There wasn't anything at all discussed about this. I just thought that everything was straight, fair, and square, and everything. * * * I came back again, I believe, in May or June, 1923. I can tell by looking at a little book that I have here. Yes; I was here about May 5, 1923. I had some business dealings or transactions with this bank on that trip. I deposited at that time $11,000. I deposited some C. D.'s on the Thayer bank on May 29th, and the deposit slip you hand me is the one they gave me at that time. They also gave me a deposit slip for the first $1,300 and these slips you hand me are the ones they gave me. (Deposit slips introduced in evidence.) * * * In regard to this deposit that I made on May 29, 1923, there had been interest accumulated on these C. D.'s that I had deposited there at that time. There was about $440, I think. The calculation of the interest was also left to the bank here. When I made these deposits and started off, when they were paid off, he figured the interest upon them, and he says, 'What do you want me to do with this?' I was going back home. He says, 'Do

you want me to collect it, or do you want to collect it yourself?' I says, 'You just collect the interest on that,' and he figured up the interest then, and my recollection now is it was $440. It was either Mr. Sanders or Mr. Rogers, one of the two, that did the work, but I have forgotten which one it was; I think it was the one that gave me this big deposit slip. * * * They did not give me a deposit slip at that time for $440, but I did receive a slip later. * * * My next visit down here was Christmas, 1923, or the beginning of 1924. I was down here at that time, I guess, about two weeks. I was sick. I only came to stay just a few days. My boy was down here, and he said we had made the trade and had moved on the farm we were to buy, and I came down to close the deal, and we didn't close the deal and I went back.

"When I was down here on the Christmas visit, I came up here to go home, and stayed all night with Mr. Wilbanks, and I says, 'Mr. Wilbanks, I have had some money in here of my own a long time, are you going to pay me any interest?' and he said 'Sure,' and I think he gave me $380. I deposited it, and he gave me a deposit slip. He gave it to me in money, and I deposited it right then in the bank, the same day he gave it to me. * * * I do not think that either of us figured up the interest that he would owe me at that time. He spoke something about that he might not pay it all, but he would pay what he could. He said he was paying it out of his own money, and he just brought that around to me and counted it out to me, and I came around in front of the bank and deposited it. The next time I visited Perryton was in August, 1924, after I failed to get the farm that we were figuring on here. Then I was figuring on buying another farm in 1924, but not here. * * * Up to that time I had kept my deposit practically the same all the time. It had remained at about $12,300. I tried to keep it at that. * * * I came to Perryton later on that year. I think it was about the 16th day of—well, I was here some time before that; that was before I left here, about the 16th day of August, that I left here. I don't think I had been here but just a few days at that time. At that time I had a conversation with Mr. Wilbanks about my account and the interest. I just remarked to Mr. Wilbanks and asked him if he was going to be as good as his word about it and he said, 'Yes,' that is about all that was said, and he went off somewhere, I don't know where he got it, and he asked me how much it would be, and I told him it wouldn't be over six months nohow. We didn't figure interest, only just six months. I got the idea of six months when my son came to Missouri. I figured it up there that I was liable to draw my money out at any time, and I did, in fact, and I didn't think I was entitled to anything at all, even if it had been on daily deposit. On that last visit I was here Mr. Wilbanks says, 'I don't consider that I owe you any interest whatever.' I don't remember that Mr. Wilbanks had any talk with me about the 1st of January that year when I was here about that. There was nothing said between us about the time interest would be figured on when we had the August talk. I don't recall that there was anything said about interest between Mr. Wilbanks and me at the time I changed the account. I don't think there

was anything said about it about April or May. And there was nothing said between me and any other party in the bank about it. As to that six-month interest I spoke about a while ago, there was nothing said about that, only I told him that was all the interest there would ever be on it, on the whole thing. I told him he was several months behind, if it was all counted, and the interest would come up that time because we expected to draw it out most any minute. I told Mr. Wilbanks that in May when I sent him the telegram. That telegram was sent about the 4th or 5th of May. I told him when I was here in August. That conversation was not when I sent him the telegram in May. It was in August that I told him that. They paid me the interest in August. He paid me $369, but he did not give me a deposit slip for that. He paid it in currency, and I deposited a part of this in the bank. * * * Those were the only interest payments ever made to me—the first for $380 and the other for $369, and 6 per cent. interest was figured."

Wilbanks, who was president of the bank, testified substantially that, when the first deposit was made by appellee, he made an agreement with appellee to pay him 7 per cent. on the $300 and 6 per cent. on the $1,-000; that appellee then asked about the guaranty law, "and I told Mr. Sweaney— he said something about wanting another C. D. later, and so I said, 'If I gave you that, and anything happened to this bank, you would not be protected, but, if you put it in a checking account, that is all right, then you will come under the protection of the law.' I says, 'Under the law a bank cannot pay interest,' but I says, 'If I were to pay you individually, that is my business, and if you leave the money here you won't lose anything on it,' and that was the deal. So I told Mr. Sweaney if I paid him interest on the deposit he would get the protection of the guaranty fund, but, if the bank did, he wouldn't. That was the way I understood the banking law at that time. That was the time that he made the deposit * * * I stated to him that, if I paid him interest individually, it would not void his protection."

This witness also testified as to the interest payments in January and August, 1924; that, when appellee was in Perryton along the latter part of December, 1923, or the first of January, 1924, he paid him some money—did not remember how much. At this visit witness told appellee that he could not pay him any further interest on the deposit because he had found out that any one paying a man interest, even though he was not connected with the bank in any way, did not have any protection of the guaranty fund. He had learned that in the meantime and told him that. And, further, the witness Wilbanks testified:

"At the time that I paid Mr. Sweaney and gave him the deposit slip for $380, we had a conversation as to the interest. I said, 'Mr. Sweaney'—he wanted his interest—and I said, 'Well, Mr. Sweaney, I was paying this inter-est, supposed to pay it myself, and I am hard up,' so that is about all I remember. Whether I told him I would get up a part of it, would pay a part of it at that time or not, I do not remember exactly about the amount of interest that would be due. About the only thing I remember is that, at the time Mr. Sweaney asked me for this interest, I knew the deposit drew $51.50 a month. My recollection is that I didn't pay him anything that was due at that time. My understanding was that he was to get 6 per cent. on his big deposit and 7 per cent. on the $300. On the August visit Mr. Sweaney came in and wanted me to pay him interest on his deposit, that is, he wanted to settle it, you see, and so he charged me interest, that is, up until after we had this conversation. I don't remember what I told him at that time, but I went around and talked to Mr. McLarty. I don't remember up to what time he had charged me interest. But at the time of the August conversation he wasn't asking for interest up to that time. I remember that. I don't remember to what date he had the interest figured up or wanted me to pay interest on this account. He had it figured up. He told me he had figured it and it was back behind that some time. The best I remember it was some two or three months behind. I know that he wasn't asking for the interest. * * * Mr. Sweaney claimed interest to the time his son left here. The interest he referred to in the August talk that he thought interest ought to be paid him was to the time his son left, but I don't know the date of his son's leaving. In connection with my talk with him in August, 1924, I did pay him interest."

From this testimony it will be seen that the promise of the bank to appellee was that he would not lose anything by leaving his money with it; that this promise was made after he had a full understanding that interest could not be paid without a forfeiture of his right to the protection of the guaranty fund; that he expected interest, and demanded and collected interest in January, 1924; that, notwithstanding Wilbanks at that time told him that he could pay no more interest, the bank did in fact make another payment of interest in August, 1924, less than ninety days before the bank went into liquidation in the hands of the banking commissioner; that this payment of interest may not have been for the full time to that date does not terminate the interest period. While it may be that appellee in figuring the amount due him only figured interest up to three or four months prior to the liquidation, is not the question. The question is: At any time within the ninety days was this an interest-bearing deposit. By his voluntary remission of a part of the interest appellee could not alter the status of the account. From the whole evidence it clearly appears, without contradiction, as we view it, that the agreement as to interest on the deposit was an attempt to evade a direct promise to pay interest and yet to pay interest. It was an attempt to eat his cake and yet keep it on the part of appellee. This was an attempt to

do indirectly, by the payment of this interest, what the law forbids. The language of the statute is "that no deposit upon which interest is being paid or contracted to be paid, either directly or indirectly by said bank, its officers or stockholders," shall come with-. in the protection of the guaranty fund plan. The case presents a clear attempt to evade the provisions of this law. Kidder v. Hall, 113 Tex. 49, 251 S.'W. 500.

[2] The fact that the jury found that appellee's account was a noninterest-bearing account does not estop this court from passing on the question. The evidence before the jury did not justify the submission of the issue to them, and does not warrant their verdict. It therefore becomes our duty to set aside the verdict and to reverse the judgment of the trial court, and to render here the judgment that should have been rendered in the trial court. Article 1626, V. S. T. C. Stats. 1914; article 1856, Revised Civil Statutes of Texas 1925; Williams v. Jones (Tex. Civ. App.) 33 S. W. 1092; Halbert v. Paddleford (Tex. Civ. App.) 33 S. W. 1092; Burkitt v. Key (Tex. Civ. App.) 42 S. W. 231, 232, writ denied; Moore v. Price, 46 Tex. Civ. App. 304, 103 S. W. 234, writ denied; Parrish v. Frey, 18 Tex. Civ. App. 271, 44 S. W. 322; Arnold v. Ellis, 20 Tex. Civ. App. 262, 48 S. W. 883; Tex. Cent. R. Co. v. Flanary (Tex. Civ. App.) 50 S. W. 726; Willoughby v. Townsend, 93 Tex. 80, 53 S. W. 581.

In this case the appellee's claim was allowed and approved by the state banking commissioner as an unsecured interest-bearing claim against the Farmers' & Stockmen's State Bank, and appellee's suit was brought to compel the commissioner to approve same as payable out of the guaranty fund. We therefore reverse the judgment of the trial court, and here render judgment that the plaintiff, J. W. Sweaney, appellee here, take nothing by his suit.